IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MICHAEL DEYETTE,<br><br>Plaintiff,<br><br>v.<br><br>OREGON DEPARTMENT OF CORRECTIONS *et al.*,<br><br>Defendants. | Case No. 6:24-cv-01015-SB<br><br>**OPINION AND ORDER** |

**BECKERMAN, U.S. Magistrate Judge.**

Michael Deyette ("Deyette"), a self-represented adult in custody ("AIC") at the Oregon State Penitentiary ("OSP"), filed this action against the Oregon Department of Corrections ("ODOC") and two ODOC officials, Daryl Borello ("Borello") and Stuart Young ("Young") (together with ODOC, "Defendants"). Deyette asserts several claims relating to Defendants' denial of Deyette's requests for religious materials while in custody.

Defendants now move for summary judgment on Deyette's claims pursuant to Federal Rule of Civil Procedure ("Rule") 56, and Deyette cross-moves for summary judgment. The Court has jurisdiction over Deyette's claims pursuant to 28 U.S.C. §§ 1331 and 1343. For the

reasons explained below, the Court grants in part and denies in part Defendants' motion for summary judgment and denies Deyette's cross-motion for summary judgment.

## BACKGROUND

Deyette is an AIC currently housed at OSP in Salem, Oregon. (Compl. at 2, ECF No. 2.) Deyette has been in ODOC's custody since July 8, 2016. (Decl. Darryl Borello Supp. Defs.' Mot. Summ. J. ("Borello Decl.") ¶ 3, ECF No. 21.) Deyette filed this action challenging ODOC's denial of access to certain books and materials on Satanism, including *The Satanic Bible* and *The Satanic Rituals* by Anton S. LaVey ("LaVey") and *The Bible of the Adversary* and *The Luciferian Tarot* by Michael W. Ford ("Ford").[1] (*See generally* Compl.)

Deyette first sought access to these materials on April 26, 2022, when he filed three religious accommodation requests. (*See* Borello Decl. Attach. 2.) In his requests, Deyette indicated that he had been practicing Satanism for approximately two years. (*Id.* Attach. 2 at 9.) Deyette shared that he has read a variety of Satanism texts that ODOC allows, including *Apotheosis* and *Luciferian Witchcraft* by Ford, and LaVey's *The Satanic Witch*. (*Id.*) Deyette explained that these texts "refer back" to the requested primary materials and that without access to those materials, he "is unable to practice his religious philosophy[.]" (Compl. at 7.)

Borello, who serves as ODOC's Administrator of Religious Services, responded to Deyette's accommodation requests on June 9, 2022. (Borello Decl. ¶ 1, Attach. 2 at 14-15.) Borello denied Deyette's request for access to *The Satanic Bible* and *The Bible of the Adversary*, affirming ODOC's prior position banning these books. (*Id.* Attach. 2 at 14-15.) Borello provided

---

[1] "The Satanic Church in America was founded in 1966 by Anton Tszander LaVey." *Cookson v. Comm'r, Maine Dep't of Corr.*, No. 1:10-cv-00256-JAW, 2012 WL 32378, at *5 (D. Me. Jan. 4, 2012) (citation omitted), *aff'd*, 2012 WL 899535 (D. Me. Mar. 15, 2012).

a list of Satanism texts, including several by LaVey, that ODOC has approved and allows AICs to access. (*Id.* at 13.)

On June 18, 2022, upon ODOC's first denial of access to *The Satanic Bible*, Deyette submitted a discrimination complaint. (*Id.* Attach. 3 at 7.) In his complaint, Deyette requested that ODOC remove *The Satanic Bible* and all other works by LaVey from the banned publications list. (*Id.*) Deyette argued that mainstream religious texts approved by ODOC contain content similar to the requested texts and ODOC's denial of access is "blatant discrimination against [his] religious freedoms and practices." (*Id.*)

Young, ODOC's Assistant Administrator of Religious Services, responded to Deyette's complaint on August 16, 2022. (*Id.* Attach. 3 at 5.) In his response, Young noted various passages from *The Satanic Bible* that advocate for "self-indulgence, self-gratification, disregard for authority and rules, preying on the weak, manipulation, vengeance, [and] violence against others including violent rituals." (*Id.*) On August 21, 2022, Deyette filed a grievance in which he refuted the meaning and context of those excerpts. (*Id.* Attach. 3 at 2-4.) On October 12, 2022, Jason Brown, ODOC's Assistant Inspector General, sent a letter to Deyette on behalf of ODOC's Inspector General, Craig Prins, informing Deyette that the AIC Complaint Review Committee had considered and denied his appeal. (*Id.* Attach. 3 at 1.)

On October 4, 2022, Deyette filed another discrimination complaint, asking ODOC to allow him to purchase and receive *The Bible of the Adversary*. (*Id.* Attach. 3 at 21-22.) Deyette alleged in his complaint that ODOC Religious Services had failed adequately to explain its previous decision to deny access. (*Id.*) On March 24, 2023, Young affirmed ODOC's ban on *The Bible of the Adversary*. (Borello Decl. ¶ 9, Attach. 3 at 19.) Young cited various excerpts from *The Bible of the Adversary* that allegedly "encourage its readers to engage in actual and symbolic

acts of violence against one's enemies, to conduct violent rituals, and to reject authority." (*Id.* Attach. 3 at 19.) Young claimed that these "values and acts" are "completely inconsistent with the Department's fundamental goals of AIC rehabilitation and the pursuit of a nonviolent, law-abiding life." (*Id.*)

Deyette appealed Young's denial on April 11, 2023. (*Id.* Attach. 3 at 10-12.) His appeal disputed Young's characterizations of *The Bible of the Adversary* and Satanism. (*Id.*) Deyette asserted that Young's reasons for denying access to the book apply equally to mainstream religious texts such as the Bible, Torah, and Quran. (*See id.*) On May 5, 2023, Gary Ninman ("Ninman"), ODOC's Acting Inspector General, denied Deyette's appeal. (*Id.* Attach. 4 at 2.)

Also on October 4, 2022, Deyette filed a discrimination complaint petitioning ODOC to approve "the Luciferian Tarot for purchase and use as religious personal property." (*Id.* Attach. 3 at 23-24.) Borello sought clarification, asking Deyette to specify which tarot deck he was requesting. (*Id.* Attach. 2 at 14.) Deyette clarified that he was requesting "*The Luciferian Tarot*." (*Id.* Attach. 2 at 5.) According to Borello, ODOC Religious Services "attempted to acquire *The Luciferian Tarot* but found that it was discontinued by the vendor." (*Id.* ¶ 11.) Instead, Borello acquired the *Occult Taro*t to review. (*Id.* Attach. 2 at 5-11.) Mike Yoder ("Yoder"), ODOC's Chief of Security, reviewed the *Occult Tarot* and determined that ODOC would not allow it due to security reasons.[2] (*Id.*)

---

[2] Defendants continue to represent that *The Luciferian Tarot* "is currently out of print, and ODOC Religious Services has been unable to obtain and review a copy of the deck." (Supp. Decl. Daryl Borello ("Borello Supp. Decl.") at 4, ECF No. 39; *see also* Defs.' Supp. Br. at 3-4, ECF No. 36.) The Court ordered both parties to submit supplemental briefing on several issues, including the availability of *The Luciferian Tarot*. (ECF No. 31.) In its order, the Court noted that *The First Book of Luciferian Tarot* appeared to be "currently available from multiple vendors[.]" (*Id.*) Defendants responded that *The First Book of Luciferian Tarot* is different from *The Luciferian Tarot*. (Borello Supp. Decl. at 4; Defs.' Supp. Br. at 4.) The Court accepts Defendants' representation that *The Luciferian Tarot* is out of print and unavailable and therefore

On September 21, 2022, Borello informed Deyette of ODOC's inability to acquire *The Luciferian Tarot* and its denial of access to the *Occult Tarot*. (*Id.* at 17.) In his October 4, 2022 discrimination complaint, Deyette noted that his original discrimination complaint "was denied based on unspecified 'security reasons'" and that other ODOC-approved tarot decks were "specific to other traditions." (*Id.* Attach. 3 at 32.) ODOC denied Deyette's discrimination complaint and his request to access *The Bible of the Adversary*. (*Id.* at 21-24.)

On May 18, 2023, Deyette filed another grievance asserting that ODOC had not adequately responded to his religious discrimination complaints regarding *The Bible of the Adversary* and *The Luciferian Tarot*. (*Id.* at 28-30.) On May 31, 2023, Joshua Lawson ("Lawson"), an ODOC Grievance Coordinator, rejected Deyette's complaint because it violated an ODOC rule prohibiting grievances from AICs related to the "processing of, response to, or late response to grievances, grievance appeals, discrimination complaints, discrimination complaint appeals, or other separate review processes." (*Id.* at 29.)

On July 18, 2023, Deyette sent an AIC Communication Form to Lawson, alleging that ODOC had only responded to one of two issues in Deyette's complaint. (*Id.* Attach. 4 at 1.) In response, on July 26, 2023, Lawson provided a copy of Ninman's May 5, 2023 response to Deyette's initial complaint. (*Id.* at 2.)

Deyette filed this action on June 24, 2024 and Defendants filed their motion for summary judgment on February 20, 2025. (Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 20.) On April 21, 2025, Deyette responded and cross-moved for summary judgment. (Pl.'s Resp. & Mot. Summ. J. ("Pl.'s Mot."), ECF No. 24.) Defendants filed a reply on May 5, 2025. (Defs.' Reply

---

grants Defendants' motion for summary judgment with respect to Deyette's requests for *The Luciferian Tarot*.

Supp. Mot. Summ. J. ("Defs.' Reply"), ECF No. 25.) On September 30, 2025, the Court requested supplemental briefing (Order, ECF No. 31), which the parties filed. (*See* Pl.'s Suppl. Br., ECF No. 35; Defs.' Suppl. Br.; Borrello Supp. Decl.; Defs.' Exs., ECF No. 43.)

In response to the Court's order requesting supplemental briefing, Borello submitted a declaration and accompanying exhibits explaining ODOC's rationale for banning the requested materials. (*See generally* Borello Suppl. Decl.; Defs.' Exs.) Borello submitted under seal "a series of scanned sections" from the requested books "that illustrate why ODOC has determined that the book[s] pose[] a threat to the safety, security, and orderly operation of ODOC facilities and are inconsistent with ODOC's mission of rehabilitation." (*See generally* Defs.' Exs.)

**LEGAL STANDARDS**

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *See* *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *See* *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, a court views the evidence in the light most favorable to, and draws all justifiable inferences in favor of, the nonmoving party. *See* *McNeil v. Sherwood Sch. Dist. 88J*, 918 F.3d 700, 706 (9th Cir. 2019) (per curiam) ("The court views 'evidence in the light most favorable to the nonmoving party,' to determine

'whether genuine issues of material fact exist.'" (quoting *George v. Edholm*, 752 F.3d 1206, 1214 (9th Cir. 2014))); *Brown v. Arizona*, 82 F.4th 863, 874 (9th Cir. 2023) ("When determining whether a genuine issue of material fact exists, [a court] 'must draw all justifiable inferences in favor of the nonmoving party.'" (quoting *Howard v. HMK Holdings, LLC*, 988 F.3d 1185, 1189 (9th Cir. 2021))). In doing so, a "court . . . may not judge credibility, weigh the evidence, or resolve factual disputes[.]" *Clarkson v. Alaska Airlines, Inc.*, 59 F.4th 424, 437 (9th Cir. 2023) (citing *Anderson*, 477 U.S. at 255). "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

Plaintiff is self-represented and therefore the Court must construe his filings "liberally" and afford him the "benefit of any doubt.'" *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citation omitted); *see also Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (noting that district courts are to "construe liberally motion papers and pleadings filed by [self-represented individuals in custody] and should avoid applying summary judgment rules strictly").

## DISCUSSION

Deyette alleges in his complaint that ODOC's denial of access to *The Satanic Bible*, *The Satanic Rituals*, and *The Bible of the Adversary* violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and his constitutional rights guaranteed by the First, Eighth, and Fourteenth Amendments.[3] (*See generally* Compl.)

---

[3] Defendants agree that Deyette has exhausted his administrative remedies with respect to his requests for access to *The Satanic Bible* and *The Bible of the Adversary*. (Defs.' Mot. at 5.) The Court also addresses Deyette's request for *The Satanic Rituals* because the parties have fully

## I. RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

Deyette alleges that ODOC's denial of access to the requested materials imposes a substantial burden on his religious exercise and ODOC has not demonstrated a compelling government interest or that banning the books is the least restrictive means of furthering a compelling government interest. (Compl. at 3; *see also* Pl.'s Mot. at 7-9.) Defendants move for summary judgment on Deyette's RLUIPA claim on the ground that ODOC's concerns for institutional safety and security justify its book ban. (Defs.' Mot. at 7-10.) Deyette cross-moves for summary judgment. (Pl.'s Mot. at 7-9.)

### A. Applicable Law

"Congress enacted RLUIPA . . . 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)); *see also* 42 U.S.C. § 2000cc-1(a) ("No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.").

RLUIPA applies to "state-run institutions—mental hospitals, prisons, and the like—in which the government exerts a degree of control unparalleled in civilian society and severely disabling to private religious exercise." *Cutter v. Wilkinson*, 544 U.S. 709, 720-21 (2005) (citing 42 U.S.C. § 2000cc-1(a)). The statute protects "institutionalized persons who are unable freely to

briefed the issue, the same analysis applies, and doing so will avoid the need for further litigation.

attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Id.*

The Ninth Circuit has recognized that RLUIPA is "more generous to the religiously observant than the Free Exercise Clause" and is "construed broadly in favor of protecting an inmate's right to exercise his religious beliefs." *Jones v. Slade*, 23 F.4th 1124, 1139 (9th Cir. 2022) (first quoting *Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005); and then citing 42 U.S.C. § 2000cc-1(a)). However, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety" and "[a]n accommodation must be measured so that it does not override other significant interests." *Cutter*, 544 U.S. at 722 ("We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns.").

To evaluate if a prison policy violates RLUIPA, "the plaintiff bears the initial burden of demonstrating that an institution's policy constitutes a substantial burden on his exercise of religion." *Jones*, 23 F.4th at 1140 (citing 42 U.S.C. § 2000cc-2(b)). In *Jones*, the Ninth Circuit explained how a plaintiff can make this "prima facie showing." *Id.* As relevant here, "[a] regulation may impact religious exercise directly, by forbidding conduct that an inmate believes he is religiously compelled to do." *Id.*

To evaluate whether a prison imposes a substantial burden on religious exercise, the Court "must first identify the religious exercise at issue." *Jones*, 23 F.4th at 1141 (citing *Greene v. Solano Cnty. Jail*, 513 F.3d 982, 987 (9th Cir. 2008)). RLUIPA broadly defines "religious exercise" to mean "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" and "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion." *Warsoldier*, 418 F.3d at 994 (first quoting 42 U.S.C. § 2000cc-2(a); and

then citing *Greene*, 513 F.3d at 986); *see also Johnson v. Baker*, 23 F.4th 1209, 1214-15 (9th Cir. 2022) ("By the plain language of RLUIPA, [courts] are forbidden from evaluating the centrality of a religious practice or belief" and courts "may only scrutinize the sincerity of the prisoner's beliefs." (first citing 42 U.S.C. § 2000cc-5(7)(A); and then citing *Cutter*, 544 U.S. at 725 n.13)); *see also id.* ("So it makes no difference that a prisoner may still practice his 'religion as a whole' under the State's restrictions, or that not every believer of the same faith practices in the same way[.]" (first citing *Greene*, 513 F.3d at 987; and then citing *Holt*, 574 U.S. at 362-63)).

The Ninth Circuit has warned against defining the scope of religious exercise at "a higher level of generality." *Jones*, 23 F.4th at 1142. For example, in *Greene*, the Ninth Circuit defined the scope of an AIC's religious exercise as "group worship, not Christianity." *Greene*, 513 F.3d at 988.

Once the plaintiff demonstrates that a prison policy substantially burdens his exercise of religion, "the burden shifts to the government to prove that the burden is the least restrictive means of furthering a compelling governmental interest." *Id.* (citing 42 U.S.C. § 2000cc-1(a), 2(b)). At this stage, courts evaluate the cited penological interests, including "necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723 (citation omitted).

**B. Analysis**

Defendants argue that banning the requested books does not "substantially burden [Deyette']s religious exercise and is the least restrictive means to meet a compelling interest." (Defs.' Mot. at 15.) Specifically, Defendants argue that the requested texts "are prohibited because they promote violence, vengeance, defiance of authority, and other behaviors that pose a security risk in the volatile prison environment." (*Id.* at 8.) Defendants allege that *The Satanic Bible* and *The Satanic Rituals* "repeatedly and specifically advocate acts of violence, including

human sacrifice, on anyone that the Satanist practitioner believes has acted unacceptably." (*Id.* at 10; *see also* Defs.' Exs. 1-2.) Defendants further claim that *The Bible of the Adversary* promotes "antagonism towards those with different beliefs, defiance of authority, unrestrained indulgence of personal desires, and total disregard for the lives and well-being of others." (*Id.*; *see also* Defs.' Ex. 3.) Deyette responds that Defendants have not submitted any evidence that practicing his religion has caused him to commit rule violations and Defendants have failed to consider "the efficacy of less restrictive measures" in violation of RLUIPA. (Pl.'s Mot. at 7-8.)

**1. Substantial Burden**

The Court must first consider if ODOC's ban of the requested materials constitutes a "substantial burden" on Deyette's "religious exercise" in violation of RLUIPA. *Jones*, 23 F.4th at 1142.

First, Defendants do not dispute the sincerity of Deyette's religious beliefs. (*See generally* Defs.' Mot.); *see also* *Harris v. Muhammad*, 165 F.4th 1345, 1353 (9th Cir. 2026) ("The district court erroneously dictated the content of [the AIC]'s beliefs [regarding his religious diet program] and questioned the centrality of those beliefs."); *see also* *Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.") (citation omitted).

With respect to the scope of Deyette's religious exercise, both sides appear to agree that the Court should evaluate Deyette's ability to practice Satanism using the requested materials instead of practicing Satanism more generally. (*See* Compl. at 28, "[Deyette] has determined that core elements of the Satanic philosophy, the proper method and liturgy of Satanic ritual, and crucial core tenets of Satanism may only be found within *The Satanic Bible* and *The Satanic Rituals*, both by [] LaVey.")

Defendants suggest that prohibiting access to the three books in question does not substantially burden Deyette's right to practice his religion because ODOC provides access to other Satanism materials. (*See* Borello Decl. ¶ 9, "Deyette is free to exercise Satanic beliefs that are not inconsistent with the safety and security of a correctional facility. Several Satanic books have been approved for AICs, including the Devil's Notebook, the Satanic Witch, the Satanic Bible—New Testament, the Necronomicon, and the Necronomicon Spellbook. ODOC also provides a Satanic prayer card, altar cloth, pentagram, black salt, and rosary for AICs to purchase.")

However, the Supreme Court has clearly instructed that "RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise . . . not whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Holt*, 574 U.S. at 361-62 ("[T]he District Court erred by concluding that the grooming policy did not substantially burden petitioner's religious exercise because 'he had been provided a prayer rug and a list of distributors of Islamic material, he was allowed to correspond with a religious advisor, and was allowed to maintain the required diet and observe religious holidays.'"); *see also Johnson*, 23 F.4th at 1215 ("[I]t makes no difference that a prisoner may still practice his 'religion as a whole' under the State's restrictions[.]" (quoting *Greene*, 513 F.3d at 987)). The Ninth Circuit has rejected similar arguments about the perceived lack of importance of a particular religious practice as "flout[ing] RLUIPA's plain text and our precedent, which prohibits courts from peering into the centrality of a religious practice or whether a particular practice is necessary to the religion." *Johnson*, 23 F.4th at 1215 (citing 42 U.S.C. § 2000cc-5(7)(A)); *Dean v. Corr. Corp. of Am.*, 108 F. Supp. 3d 702, 712 (D. Ariz. 2014) ("[I]f Plaintiff

establishes that his need for his requested religious diet is a sincerely held religious belief, denial of the diet is a substantial burden to his religious practice.").

For these reasons, the Court finds that Deyette has met his prima facie burden of demonstrating that Defendants' denial of access to the requested materials creates a substantial burden on Deyette's ability to practice his religion. *See Holt*, 574 U.S. at 361-62 (holding that the plaintiff "met his burden of showing that the [prison]'s grooming policy substantially burdened his exercise of religion" despite the availability of alternative ways to practice his religion); *Johnson*, 23 F.4th at 1215 (holding that the plaintiff "met his burden of proving that the Nevada regulation [banning the use of scented oils] implicates his religious exercise"); *Jackson v. Patzkowski*, 468 F. Supp. 3d 1328, 1340 (E.D. Wash. 2019) (holding that the plaintiff identified "*Grimorium Verum* as a sacred writing, for which *The Satanic Bible* is not a substitute, because the ritual book deals extensively with demonology and depriving him of it denies him important religious knowledge"); *cf. Jackson v. Bell*, No. 2:21-cv-1814-KJM-DMC-P, 2025 WL 2675818, at *3 (E.D. Cal. Sept. 18, 2025) (holding that it was "reasonable to infer from [the plaintiff's] allegation that . . . the practice of his religion was burdened by denial of *The Satanic Bible*"), *findings and recommendation adopted*, 2025 WL 2879331 (E.D. Cal. Oct. 9, 2025); *Ruley v. Stovall*, No. 10-cv-142-KKC, 2012 WL 1038665, at *4 (E.D. Ky. Mar. 27, 2012) ("Avoiding an in-depth examination of the particulars of Satanism and its tenets, the Court assumes without deciding that not having a copy of the Satanic Bible presents a practical and substantial burden on an adherent's actual practice of those tenets of his belief[.]"), *aff'd* (Mar. 11, 2013).

**2. Compelling Interest**

Turning to Defendants' burden to demonstrate a compelling government interest to prohibit access to religious materials, Defendants argue that permitting Deyette to access the books would endanger the security of the institution and safety of staff and other AICs. (*See*

Defs.' Mot. at 15-16.) Defendants present evidence that ODOC has reviewed *The Satanic Bible*, *The Satanic Rituals*, and *The Bible of the Adversary* and concluded that each "promotes behavior that is a threat to the safety and security of staff and AICs." (Borello Decl. ¶¶ 16, 25.) Deyette responds that Defendants have offered no evidence that his possession of the requested books would threaten prison security. (Pl.'s Compl. at 25; Pl.'s Mot. at 9.)

Under RLUIPA, "prison security is a compelling state interest, and . . . deference is due to institutional officials' expertise in this area." *Cutter*, 544 U.S. at 725 n.13. Nevertheless, RLUIPA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Burwell,* 573 U.S. at 726 (quoting *Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430-31 (2006)).

Although the Court has "no doubt that 'prison security is a compelling state interest[,]'" *Johnson*, 23 F.4th at 1217 (first quoting *Cutter*, 544 U.S. at 725 n.13; and then citing *Holt*, 574 U.S. at 363), courts may not "grant 'unquestioning deference' to the government's claim of a general security interest." *Id.* (quoting *Holt*, 574 U.S. at 364); *see also Semla v. Snyder*, No. 03-cv-00015-JPG, 2006 WL 1465558, at *11-13 (S.D. Ill. May 24, 2006) (finding that a "[a] conclusory statement that safety and security are at stake is not enough" to justify a prison's ban on Satanism materials, including *The Satanic Bible*, and holding that the defendants "failed to produce any evidence as to what compelling government interest in institutional security and order was at issue").

Here, Defendants have offered only conclusory opinions that the requested materials threaten institutional security. *See Koch v. Carlisle*, No. CIV-15-811-HE, 2017 WL 1134854, at *5 (W.D. Okla. Mar. 2, 2017) ("While courts should respect the expertise of prison officials in

evaluating the likely effects of altering prison rules, RLUIPA does not permit unquestioning deference. Defendants' arguments border on unquestioning deference.") (citations omitted), *report and recommendation adopted*, 2017 WL 1133465 (W.D. Okla. Mar. 24, 2017). In addition, Defendants have not demonstrated how their security concerns apply specifically to Deyette—who attests he is a pro-social, non-disruptive AIC with no history of disciplinary issues (*see* Compl. at 4; Pl.'s Mot. at 4, 8)—as RLUIPA requires. *See Burwell,* 573 U.S. at 726.

Further, Defendants offer no expert opinion or evidence, or even an example, of how access to the banned books have created security issues in other prisons. As Deyette points out, the Washington Department of Corrections does not ban the requested materials, yet Defendants have not presented evidence of any resulting security issues in Washington (or other state) prisons. (*See* Pl.'s Mot. at 1, noting that *The Satanic Bible* has "been approved for inmate access in institutions across the United States, including Oregon's nearest neighbor, Washington State"); *see also Jackson*, 468 F. Supp. 3d at 1338 (noting that *The Satanic Bible* is permitted in Washington prisons); *LaFerriere v. Baltzwell*, No. 321CV05175RAJTLF, 2024 WL 1198897, at *5 (W.D. Wash. Feb. 28, 2024) ("Plaintiff currently resides in the general prison population, and therefore has access to the Satanic Bible already in her possession according to her property matrix, or she can purchase a Satanic Bible[.]"), *report and recommendation adopted*, 2024 WL 1193120 (W.D. Wash. Mar. 20, 2024). Further, Defendants have not presented evidence of any rule violations by Deyette after he began practicing Satanism. (*See* Pl.'s Mot. at 4, noting that ODOC staff members recommended Deyette for employment as a peer companion to assist fellow AICs with mental health issues, describing Deyette as "helpful, compassionate, and courteous in his interactions with staff and AICs".)

///

Although the Court does not question Defendants' compelling interest in institutional security generally, there remains a dispute of material fact regarding whether institutional security requires restricting Deyette's access to the banned books. *See Wares v. VanBebber*, 319 F. Supp. 2d 1237, 1250 (D. Kan. 2004) ("[T]he court denies defendants' motion for summary judgment because there is a genuine factual dispute as to whether defendants' proffered security justification is pretextual, which precludes defendants from being entitled to judgment as a matter of law."); *cf. Ramirez v. Coughlin*, 919 F. Supp. 617, 622 (N.D.N.Y. 1996) ("Prison safety and security are certainly compelling governmental interests. 'However, defendants cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct.'" (quoting *Campos v. Coughlin*, 854 F. Supp. 194, 207 (S.D.N.Y. 1994))).

**3. Least Restrictive Means**

The final step in the RLUIPA analysis tasks the Court with considering whether ODOC's book ban is the "least restrictive alternative to achieve a compelling governmental interest." *Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2008) (citing *Warsoldier*, 418 F.3d at 998). This is an "exceptionally demanding" standard that "requires the government to 'sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.'" *Holt*, 574 U.S. at 353 (quoting *Burwell*, 573 U.S. at 728). To meet this burden, Defendants must demonstrate that they "actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999 (citation omitted). The Ninth Circuit has further cautioned that "in light of RLUIPA, no longer can prison officials justify restrictions on religious exercise by simply citing to the need to maintain order and security in a prison" because "RLUIPA requires more." *Greene*, 513 F.3d at 989-90.

"[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means." *Warsoldier*, 418 F.3d at 1000 (citation omitted); *see also Ramirez v. Collier,* 595 U.S. 411, 429 (2022) (holding that a ban on audible prayer during an execution was not the least restrictive means of furthering a compelling interest because other jurisdictions had successfully executed death row inmates without banning audible prayer). Defendants do not explain why other institutions with the same compelling interests—such as Washington's state prisons—were able to accommodate the same religious practices that Deyette seeks here.

Nor do Defendants address the availability of less restrictive means. *See Holt*, 574 U.S. at 364 (holding that the prison "cannot show that forbidding very short beards is the least restrictive means of preventing the concealment of contraband"); *id.* at 365 ("[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000))). For example, "an obvious, ready alternative to banning the entire ritual book is redacting only those specific pages that cause concern[.]"[4] *Jackson*, 468 F. Supp. 3d at 1341; *see also Johnson*, 23 F.4th at 1218 ("Nevada thus failed to meet its 'exceptionally demanding' burden of proving that its ban was the least restrictive means of furthering its security interest." (citing *Holt*, 574 at 364)); *cf. Holt*, 574 U.S. at 365 (finding that "[t]he [prison] failed to establish that it could not satisfy its security concerns by simply searching petitioner's beard" and holding that the prison's "interest in eliminating

[4] Defendants filed under seal several pages of the banned materials with problematic excerpts highlighted (*see* Defs.' Exs.), but the Court notes that the highlights are few and far between and it does not appear to be burdensome to redact the highlighted excerpts for Deyette's use.

contraband cannot sustain its refusal to allow petitioner to grow a ½–inch beard”). In addition, enforcing existing disciplinary rules would appear to be a less restrictive alternative if the books caused Deyette to engage in misconduct. *See Ramirez*, 595 U.S. at 430 (holding that enforcing existing misconduct rules that subject “advisors to immediate removal for failure to comply with any rule” during an execution is a less restrictive alternative).

For these reasons, the Court finds that genuine issues of material fact remain regarding whether ODOC’s book ban is the least restrictive means of furthering Defendants’ interest in institutional security. *See Rouser v. White*, 630 F. Supp. 2d 1165, 1187 (E.D. Cal. 2009) (denying the defendants’ motion for summary judgment on RLUIPA claim and holding that “the defendants must show that they ‘actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice” and “[i]nsistence that the court defer to prison officials’ judgment cannot suffice” (first quoting *Warsolider*, 418 F.3d at 999; and then citing quoting *Warsolider*, 418 F.3d at 1001)); *cf. Ramirez*, 919 F. Supp. at 622 (“At a minimum, genuine issues of material fact exist as to whether denying plaintiff the use of such a bell for ‘security reasons’ is the least restrictive means of furthering the government’s interests in prison safety and security. Thus, summary judgment is inappropriate with regard to this issue.”).

**4. Summary**

In light of the disputed issues of material fact discussed above, the Court denies the parties’ motions for summary judgment on Deyette’s RLUIPA claim. *See Jackson*, 468 F. Supp. 3d at 1341 (holding that the defendant prison was “not entitled to judgment as a matter of law” on the plaintiff’s RLUIPA claim challenging a ban on *Grimorium Verum*, a different Satanism text); *Semla*, 2006 WL 1465558, at *13 (denying the defendant’s motion for summary judgment

on the plaintiff's RLUIPA claim challenging bans of *The Satanic Bible* and *The Satanic Rituals*).[5]

## II. CONSTITUTIONAL CLAIMS

Deyette alleges that Defendants' denial of access to *The Satanic Bible*, *The Satanic Rituals*, and *The Bible of the Adversary* violates his constitutional rights under the First and Fourteenth Amendments.[6] (Compl. at 28.) Specifically, Deyette alleges that Defendants (1) violated the Free Exercise Clause by denying access "to necessary religious texts" (*id.* at 23-24); (2) violated the Establishment Clause by enforcing policies "that establish preference for one religion over another" and by refusing to "change their 'current stance on Satanic issues', a policy not preserved in statute or regulation, . . . which grants preference to Abrahamic religions, and disenfranchises the religion of Satanism" (*id.* at 3); (3) violated the Equal Protection Clause

---

[5] *But see* *Godstone v. Pedro*, No. 2:24-cv-00181-JR, 2025 WL 1040893, at *4 (D. Or. Apr. 8, 2025) (granting the defendants' motion for summary judgment on RLUIPA claim seeking access to *The Satanic Bible* and *The Satanic Rituals*); *Goninan v. Holmes*, No. 6:12-cv-01555-PK, 2014 WL 6966990, at *9 (D. Or. Dec. 4, 2014) (granting the defendants' motion for summary judgment on RLUIPA claim challenging ODOC's ban on *The Satanic Bible*); *Johnson v. Williams*, No. 3:07-cv-1659-HZ, 2011 WL 6778711, at *9 (D. Or. Dec. 22, 2011) (granting the defendants' motion summary judgment on RLUIPA claim challenging a ban on Satanism texts). The Court notes that two of these cases were decided before the Supreme Court's *Holt* (2015) and *Ramirez* (2022) opinions which departed from the historical deference provided to prison administrators on religious practices.

[6] Deyette also alleges that "Defendants wish to punish him for his practice of Satanism by forcing him to undergo lengthy legal proceedings, and endure ridicule and scorn in their responses, constituting extrajudicial punishment, in violation of the Cruel and Unusual Punishment Clause of the 8th Amendment to the US Constitution." (Pl.'s Mot. at 6; *see also* Compl. Attach. 2 at 7.) In the prison context, only "'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright*, 430 U.S. 651, 670 (1977) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)). Deyette does not explain how Defendants' denial of his book requests rises to the level of cruel and unusual punishment. Without more, there is no genuine dispute of material fact as to whether Defendants' actions violated Deyette's Eighth Amendment rights. For these reasons, the Court grants Defendants' motion for summary judgment and denies Deyette's cross-motion for summary judgment on his Eighth Amendment claim.

by denying his "exercise of the religion, or no religion, of [his] choice" (*id.* at 26-27); and (4) violated the Due Process Clause by depriving him of property (*id.* at 27).

### A. First Amendment and Equal Protection Clause Claims

#### 1. Applicable Law

##### a. Free Exercise Clause[7]

"[T]he free exercise of religion is a fundamental constitutional right." *Johnson v. Robison*, 415 U.S. 361, 375 (1974). Consequently, "[t]he right to exercise religious practices and beliefs does not terminate at the prison door." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (citing *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987)); *see also Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008) ("Inmates retain the protections afforded by the First Amendment, 'including its directive that no law shall prohibit the free exercise of religion.'") (citation omitted). "The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *Id.* (citation omitted). Such deprivations must be "reasonably related to legitimate penological objectives." *Turner v. Safley*, 482 U.S. 78, 87 (1987).

The Supreme Court's four-factor *Turner* test "governs inmate free exercise claims brought under the First Amendment." *Alvarez*, 518 F.3d at 1156 (citation omitted). The *Turner* test considers four factors: "(1) whether the regulation is rationally related to a legitimate and neutral governmental objective; (2) whether there are alternative avenues that remain open . . . to

---

[7] The Court does not construe Deyette's complaint to include a separate claim arising under the Oregon Constitution (*see* Compl. at 24-25, citing Article I, sections 2 and 3 of the Oregon Constitution in "further support" of his federal claims) and he did not respond to Defendants' arguments relating thereto. In any event, "[t]he Oregon Supreme Court has held that the rights granted under [Article I, Sections 2 and 3] of the Oregon Constitution are 'identical in meaning' with the guarantee of religious freedom contained in the First Amendment to the federal Constitution." *Kemp v. Workers' Comp. Dep't*, 672 P.2d 1343, 1346 (Or. Ct. App. 1983), *opinion adhered to as modified on reconsideration*, 677 P.2d 725 (Or. Ct. App. 1984).

exercise the right; (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and (4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials." *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) (citing *Turner*, 482 U.S. at 89).

In conducting this analysis, courts defer to prison officials tasked with the "inordinately difficult undertaking" that is "[r]unning a prison." *Turner*, 482 U.S. at 85. However, although "officials are entitled to deference, they may not advance restrictions based on arbitrary, exaggerated or pretextual reasons." *Doty v. Lewis*, 995 F. Supp. 1081, 1083 (D. Ariz. 1998) (citations omitted).

**b. Establishment Clause**

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. AMEND. I. The Establishment Clause prohibits "an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993). "[T]he Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022) (first quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014); and then citing *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019)).

If a plaintiff shows "that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable,'' the Court will in turn "'shift[] [its focus] to the defendant' to show that the challenged action survives strict scrutiny." *Loffman v. Cal. Dep't of Educ.*, 119 F.4th 1147, 1170 (9th Cir. 2024) (quoting *Kennedy*, 597 U.S. at 524-25). Under this standard, "a law restrictive of religious practice must advance

'interests of the highest order' and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye*, 508 U.S. at 546 (quoting *McDaniel* v. *Paty*, 435 U.S. 618, 628 (1978)).

**c. Equal Protection Clause**

"The Equal Protection Clause requires the State to treat all similarly situated people equally." *Shakur*, 514 F.3d at 891 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Within the prison context, the Equal Protection Clause guarantees "each prisoner . . . 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Id.* (quoting *Cruz* v. *Beto*, 405 U.S. 319, 322 (1972)). The Ninth Circuit has instructed that equal protection claims are "generally governed by the four-part balancing test required by *Turner*[.]" *Fuqua v. Raak*, 120 F.4th 1346, 1356 (9th Cir. 2024) (quoting *Cruz*, 405 U.S. at 322).

**2. Analysis**

For the same reasons discussed above, the Court finds that material disputes of fact preclude resolution of Deyette's claims under the Free Exercise Clause, Establishment Clause, and Equal Protection Clause at summary judgment.

With respect to the *Turner* test, there remain material factual disputes about how ODOC's objectives relate to its prohibition of the requested books, if there are reasonable alternative avenues for Deyette to exercise his rights, the impact that access to Satanism materials will have on prison security, and whether there exist less intrusive alternatives. *See Turner*, 482 U.S. at 89 (outlining the four-part test). Accordingly, the Court denies the motions for summary judgment on Deyette's Free Exercise Clause and Equal Protection Clause claims. *See Fuqua*, 120 F.4th at 1356-60 (holding that genuine issues of material fact precluded summary judgment for prison chaplain on AIC's Free Exercise Clause and Equal Protection

Clause claims); *see also Howard v. United States.,* 864 F. Supp. 1019, 1028 (D. Colo. 1994) (denying the defendants' motion for summary judgment on the plaintiff's Free Exercise Clause claim that the defendants failed to accommodate the plaintiff's practice of Satanism).

Further, there is a genuine dispute of material fact regarding whether Defendants have favored other religions and discriminated against Satanism. Specifically, Deyette raises a credible argument that passages in approved religious texts reference similar themes that Defendants prohibit as a security risk in the Satanism texts. (*See* Borello Decl. Attach. 2 at 14-15, asserting that *The Satanic Bible* encourages "preying on the weak, manipulation, vengeance, [and] violence against others including violent rituals"; Compl. at 31, alleging that "in the Old and New Testaments, and the Quran, the faithful are explicitly commanded to convert or kill any 'infidel' that does not accept their faith on pain of death, to murder homosexuals, prostitutes, adulteresses, and commit genocide against any culture not descended from the Twelve Tribes of Israel.") Accordingly, a reasonable fact finder comparing the texts on a more developed record could conclude that allowing mainstream religious texts while prohibiting Satanism texts violates the Establishment Clause. *See Riggs v. Davis*, No. 3:24-cv-00443-ART-CLB, 2025 WL 3222501, at *8 (D. Nev. July 17, 2025) (denying the defendants' motion to dismiss the plaintiff's Establishment Clause claims on the ground that the plaintiff alleged prison officials enforced "several policies and practices . . . to advantage Protestant inmates (and inmates of other faith groups), while intentionally disadvantaging Catholic and LDS inmates"); *cf. Douglas* v. *Stahlnecker*, No. 6:20-cv-00546-IM, 2024 WL 1345684, at *7 n.4, *8 (D. Or. Mar. 31, 2024) (granting the defendants' motion for summary judgment where there was no evidence that the defendants "condoned a particular religion or religious belief or acted out of hostility toward [the

plaintiff's] religion"). Accordingly, the Court denies the parties' motions for summary judgment on Deyette's Establishment Clause claim.

### B. First Amendment Retaliation Claim

Deyette also alleges that Defendants retaliated against him for exercising his First Amendment right to file grievances to vindicate his rights. (Compl. at 7.) Specifically, Deyette claims that he "has made every effort to comply with ODOC regulations, and pursue a resolution to his needs through the proper channels and methods" and that his "efforts have been met with delays, derision, bias, and dismissal . . . result[ing] in considerable stress and internal conflict, contributing to extrajudicial suffering[.]" (*Id.*) Defendants argue that they "have imposed restrictions only when justified by safety and security concerns." (Defs.' Mot. at 16.)

#### 1. Applicable Law

AICs have "a First Amendment right to file grievances and to be free from retaliation for doing so." *Singh v. Washburn*, No. 2:14-cv-01477-SB, 2016 WL 1039705, at *7 (D. Or. Feb. 5, 2016) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)), *findings and recommendation adopted*, 2016 WL 1045523 (D. Or. Mar. 15, 2016). "Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of 'clearly established law.'" *Brodheim*, 584 F.3d at 1269 (citations omitted).

"In the prison context, a 'viable claim of First Amendment retaliation' must contain the following five 'basic elements': '(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal.'" *Grenning v. Key*, No. 23-3018, 2026 WL 2509407, at *10 (9th Cir. Aug. 26, 2026) (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)).

### 2. Analysis

Deyette alleges that Defendants retaliated against him for seeking to vindicate "his rights and religious freedoms . . . through the proper channels and methods[.]" (Compl. at 7.) Deyette's claim relates to two separate First Amendment rights: his right to freely exercise his religion and his "right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim*, 584 F.3d at 1269).

Deyette does not identify any specific retaliatory action that he suffered for requesting the Satanism materials or submitting grievances and appeals aside from the repeated denials of his requests. Although there is no dispute that Defendants denied his requests, such denials do not by themselves constitute unconstitutional retaliation. *See Kakatin v. Kiaina*, No. 15-00337 JMS/BMK, 2015 WL 9460119, at *5 (D. Haw. Dec. 23, 2015) (holding that "[i]f simply denying a grievance is enough to support a claim of retaliation, however, every grievance procedure that is upheld in every case would be subject to claims of retaliation"). There is nothing in the record to suggest that Defendants threatened or engaged in "punishment or adverse regulatory action" in response to Deyette's exercise of his religion, his requests for materials, or his grievances and appeals relating thereto. *See Jenkins* v. *Sinclair*, No. C17-5192-BHS-TLF, 2018 WL 4608312, at *9 (W.D. Wash. Sept. 4, 2018), *report and recommendation adopted*, 2018 WL 4584269 (W.D. Wash. Sept. 25, 2018). On the contrary, the record reflects that Defendants have responded to Deyette's requests by obtaining and reviewing the requested materials and approving alternative Satanism materials to accommodate Deyette's religion.

For these reasons, the Court grants Defendants' motion for summary judgment and denies Deyette's cross-motion for summary judgment on Deyette's First Amendment retaliation claim. *See Hentz v. Ceniga*, 402 F. App'x 214, 215 (9th Cir. 2010) (holding that "conclusory allegations of retaliation . . . [are] insufficient to establish a triable issue as to [the plaintiff's]

retaliation claim); *Paulino v. Todd*, 338 F. App'x 720, 722 (9th Cir. 2009) (holding that "[t]he district court properly granted summary judgment on [the plaintiff's] retaliation claim because he failed to present evidence of retaliatory motive").

**C. Due Process Clause Claim**

Deyette alleges that "by refusing to allow [him] to receive a copy of the Satanic Bible, at his own expense, per his request," Defendants "are depriving [him] of property, without due process of law." (Compl. at 27.) Deyette acknowledges that Defendants provided him notice of and the right to appeal their decisions (i.e., due process), but he alleges a lack of neutrality in the grievance and appeal process. (*See id.* at 24, "[Deyette] alleges that Defendants deprived [him] of [his] Fourteenth Amendment rights to . . . Due Process by denying [Deyette's] religious texts, named above, based on a biased process rather than legitimate penal interests"; *id.*, "The testimony of former Administrator of Religious Services for ODOC, Gary Sims, and the responses of Daryl Borello and Stuart Young to [Deyette's] Religious Accommodation Request (and subsequent Discrimination Complaints), make it quite obvious that the bias they have toward Satanism[.]") Defendants move for summary judgment on the ground that, *inter alia*, Deyette "received notice and a multi-level review of his complaint." (Defs.' Mot. at 20.)

Due process in the prison setting requires that decision-makers must be "sufficiently impartial." *Wolff v. McDonnell*, 418 U.S. 539, 570-72 (1974). The Supreme Court has held that unfavorable or adverse rulings alone are insufficient to show bias "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Steffey v. Salazar*, No. 3:19-cv-0093-JR, 2020 WL 2530084, at *3 (D. Or. Feb. 25, 2020) ("There is a presumption of honesty and integrity on the part of decision makers which may be overcome by evidence of a risk of actual bias or prejudgment based on special facts and circumstances." (citing *Withrow v. Larkin*, 421 U.S. 35,

46-47 (1975)), *findings and recommendation adopted*, 2020 WL 2529616 (D. Or. May 18, 2020), *appeal dismissed*, 2020 WL 9888919 (9th Cir. Dec. 8, 2020).

Deyette alleges that the ODOC officials who denied his requests for Satanism materials were biased against Satanism but he has not presented any evidence that Defendants or any other ODOC officials demonstrated bias or impartiality toward Satanism beyond legitimate concerns about its impact on institutional security. *See Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) ("In the absence of any evidence of some extrajudicial source of bias or partiality, neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity, even if those remarks are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases.'") (simplified), *cert. denied*, 555 U.S. 871 (2008); *Mancha v. Thomas*, 550 F. App'x 426, 427 (9th Cir. 2013) ("On this record, the [prison official]'s finding does not show that [the plaintiff] was denied an impartial decision maker in violation of due process. " (citing *Liteky*, 510 U.S. at 555)); *Chavez v. Peters,* No. 2:16-cv-02225-MO, 2019 WL 922237, at *6 (D. Or. Feb. 25, 2019) (granting the defendants' motion for summary judgment because "[a]lthough the adverse decision by the hearings officer might give [the plaintiff] the belief that the decisionmaker was biased, that belief, without more, is insufficient to overcome the presumption of the [prison official]'s impartiality").

For these reasons, the Court grants Defendants' motion for summary judgment and denies Deyette's motion for summary judgment on Deyette's Due Process Clause claim.

## III. DAMAGES

In addition to injunctive relief, "Plaintiff requests this court to award him compensatory damages in the amount of $300,000 US[D] for psychological and spiritual suffering incurred by ODOC Religious Services, and continuing to accrue at a rate of $5,000 per day, from 26 April, 2022 until this matter is fully resolved, against each Defendant, jointly and severally." (Compl.

Attach 2 at 7.) Defendants argue that "Plaintiff is not entitled to monetary relief for any of his claims." (Defs.' Mot. at 22.)

**A. RLUIPA**

With respect to Deyette's RLUIPA claim, Defendants are correct that "suits seeking monetary damages [are foreclosed] under RLUIPA against state officers." *Fuqua*, 120 F.4th at 1349 (citing *Wood v. Yordy*, 753 F.3d 899, 903 (9th Cir. 2014)); *see also Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("RLUIPA does not authorize suits for damages against state officials in their individual capacities because individual state officials are not recipients of federal funding and nothing in the statute suggests any congressional intent to hold them individually liable.") (citation omitted); *Barra v. Tulare Cnty. Sheriff's Dep't*, No. 1:23-cv-01746-FRS (BAM) (PC), 2026 WL 607957, at *3 (E.D. Cal. Mar. 4, 2026) ("Money damages are not available under RLUIPA against the state or state officials sued in their official capacities, and RLUIPA does not contemplate liability of government employees in their individual capacity. Thus, a RLUIPA claim may proceed only for declaratory or injunctive relief against defendants acting within their official capacities." (first citing *Sossamon v. Texas*, 563 U.S. 277, 279 (2011); then citing *Wood*, 753 F.3d at 904; and then citing *Jones*, 791 F.3d at 1031)), *findings and recommendation adopted*, 2026 WL 927866 (E.D. Cal. Apr. 6, 2026); *Barra v. Boudreaux*, No. 1:24-cv-00966-BAM, 2025 WL 637090, at *3 (E.D. Cal. Feb. 27, 2025) (holding that "[m]oney damages [were] not available under RLUIPA" for the plaintiff's suit against state officials for banning *The Satanic Bible*), *findings and recommendation adopted*, 2025 WL 959431 (E.D. Cal. Mar. 31, 2025).

Accordingly, the Court grants Defendants' motion for summary judgment and denies Deyette's cross-motion for summary judgment on Deyette's claim for damages under RLUIPA.

///

### B. Constitutional Claims

Defendants argue that qualified immunity shields them from damages for Deyette's constitutional claims. (*See* Defs.' Mot. at 22, "Additionally, Defendants are entitled to qualified immunity on Plaintiff's constitutional claims.").

#### 1. Applicable Law

"The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Dunn v. Castro*, 621 F.3d 1196, 1198-99 (9th Cir. 2010) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

A qualified immunity analysis involves two steps. *Id*. at 1199. First, the court must determine "whether the facts alleged, construed in the light most favorable to the injured party, establish the violation of a constitutional right." *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Next, the court must determine "whether the right is clearly established such that a reasonable government official would have known that 'his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier*, 533 U.S. at 202). This generally requires either controlling authority or a "robust consensus of cases of persuasive authority." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2005).

#### 2. Analysis

The Court finds that when Defendants denied Deyette access to the Satanism materials in question, they were not on notice that "their conduct was unlawful in the situation [they] confronted." *Saucier*, 533 U.S. at 202. Specifically, there is no controlling authority, nor "robust consensus of cases of persuasive authority," that would have put Defendants on notice that banning materials on Satanism in a prison setting would violate Deyette's constitutional rights.

*See Jackson v. Patzkowski*, No. C18-1508-RSM-MLP, 2020 WL 13219613, at *26 (W.D. Wash. July 14, 2020) (finding that "a reasonable official at the time would not have known that rejecting the *Grimorium Verum* violated Plaintiff's constitutional rights" because historically courts have upheld prisons' bans on "Satanic books that encourage violent acts and human sacrifice") (citations omitted), *report and recommendation adopted*, 2022 WL 1186208 (W.D. Wash. Apr. 21, 2022); *see also Kisela v. Hughes*, 584 U.S. 100, 105 (2018) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.") (simplified).

On the contrary, many courts, including judges in this district, have historically deferred to the opinions of prison officials and rejected claims challenging a prison's ban on *The Satanic Bible* and similar texts and materials. *See, e.g.*, *Goninan*, 2014 WL 6966990, at *9 ("Based on my analysis above regarding the *Turner* factors and the general facts concerning [the plaintiff]'s claims, I conclude that ODOC officials are justified in considering the texts at issue likely to create serious security and safety risks within the prison, both for inmates and prison staff."); *Johnson*, 2011 WL 6778711, at *11 ("[I]t is clear that *The Satanic Bible* is justifiably considered by prison officials, to whose expertise [the judge] defer[s], to create serious security and safety risks within the prison, for inmates and prison staff.").

Because an AIC's right to access *The Satanic Bible, The Satanic Rituals*, and *The Bible of the Adversary* while in custody was not clearly established, the Court finds that Defendants are entitled to qualified immunity with respect to Deyette's claim for damages on his constitutional claims. Accordingly, the Court grants Defendants' motion for summary judgment and denies Deyette's cross-motion for summary judgment on Deyette's damages claims.

**CONCLUSION**

For the reasons stated, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment (ECF No. 20) and DENIES Deyette's cross-motion for summary judgment (ECF No. 24). The Court will enter judgment for Defendants on Deyette's Eighth Amendment claim, First Amendment retaliation claim, Due Process Clause claim, and prayer for damages, and will schedule Deyette's remaining claims for a bench trial.[8]

**IT IS SO ORDERED.**

DATED this 4th day of September, 2026.

HON. STACIE F. BECKERMAN
United States Magistrate Judge

[8] In its September 30, 2025 order, the Court requested that both parties submit briefing on the Ninth Circuit's recent holding in *Spirit of Aloha Temple*, in which the Ninth Circuit held that the issue of whether a regulation "imposes a substantial burden on a party's exercise of religion under [RLUIPA] is a question of law for the court to decide." *Spirit of Aloha Temple v. County of Maui*, 132 F.4th 1148, 1156 (9th Cir. 2025). Both parties appear to agree that in light of the Ninth Circuit's guidance, the Court will decide the questions presented herein. (*See* Pl.'s Suppl. Br. at 1; Defs.' Suppl. Br. at 5-6.) In light of Deyette's inability to view the materials at issue, the Court will appoint pro bono counsel to represent Deyette at trial (and at a judicial settlement conference, if the parties so request).